**SOUTHDOWN, INC., and SDW, Inc., Plaintiffs,**

**v.**

**MOORE McCORMACK RESOURCES, INC., and Paul R. Tregurtha, Defendants.**

**Civ. A. No. H-88-557.**

United States District Court, S.D. Texas, Houston Division.

April 4, 1988.

J. Clifford Gunter, III, Jim L. Flegle, Jr., BRACEWELL & PATTERSON, Houston, Tex., for plaintiffs.

Richard H. Caldwell, Gerald L. Bracht, MAYOR, DAY & CALDWELL, Houston, Tex., for defendants.

## MEMORANDUM ON THE PRELIMINARY INJUNCTION

HUGHES, District Judge.

In late February, Southdown, through a subsidiary, announced to the public an offer to purchase all the shares of Moore McCormack Resources for $31 a share. Before Moore McCormack could respond, the open market for the shares had risen to about $35 per share. Southdown raised its offer to $35 per share simultaneously with Moore McCormack's management announcing that the initial offer was grossly inadequate and that the board was considering defensive measures to defeat Southdown's attempt to acquire control of the company.

The imminent adoption of hostile tactics by Moore McCormack's management pro-

voked Southdown to seek emergency temporary relief from this court. The first hearing resulted in an agreed order that Moore McCormack would institute no other litigation over the questions raised in the action here. Several days later, Moore McCormack filed a suit in the United States District Court for Connecticut claiming securities law violations by Southdown. After another hearing, Southdown obtained an order in this litigation prohibiting further action in the Connecticut case.

The announcement by Moore McCormack that it was going to propose a restructuring of the company to thwart Southdown precipitated another hearing on emergency relief. This court restrained the alteration of Moore McCormack's corporate structure until a hearing could be held as scheduled several days later. The court of appeals vacated that order the next day, but no changes were enacted by Moore McCormack by the day of the preliminary injunction hearing.

During the second day of the hearing, Southdown amended its offer to $35 cash plus a $5 bond. At the conclusion of the hearing, both parties requested that no decision be rendered until the following Monday. In mid-week, both parties sought a decision. Meanwhile, Southdown raised its offer to $40 per share, all cash.

■ Until a full trial can be held, Moore McCormack will be enjoined from (a) adopting a restructuring without a vote of the shareholders, (b) failing to redeem the rights, or (c) excluding any shareholder from equal treatment by the company with all other holders of the same class of stock. The trial will be set for 9:30 a.m., Tuesday, June 21, 1988.

*The Legal Issues.*

Southdown, Inc., and its subsidiary, SDW, Inc., have sought a preliminary injunction to enjoin Moore McCormack Resources, Inc., from employing two specific tactics to defeat Southdown's attempt to buy its stock. The first tactic is its shareholder option plan, known in the jargon of Wall Street as a "poison pill". The second tactic is to recapitalize the company before Southdown's offer expires, known as "scorched earth".

Southdown's position is that the management of Moore McCormack breached its fiduciary duty by employing these tactics and violated the securities laws by not fully disclosing its recapitalization plan and by announcing it to affect the market adversely to Southdown.

The court's role in a take-over battle is to ensure that the parties are working in a free market and that all material facts are fully disclosed to the shareholders and the public.

In order to obtain a preliminary injunction, Southdown has the burden to show:

(1) a likelihood of success on the merits;

(2) an irreparable, legally cognizable injury that it will probably suffer if an injunction is not issued;

(3) an absence of an offsetting injury to Moore McCormack that would be caused by the injunction; and

(4) no disservice to unrepresented third parties and specific public interests.

*Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 711 (5th Cir. 1984).

The parties have agreed that the laws of Delaware and of the United States apply to this case.

Southdown has shown that Moore McCormack's board will be in dereliction of its fiduciary duties if the defensive mechanisms are implemented. The evidence shows a probable success by Southdown on its claims. No injury has been suggested that would flow from the injunction's issuance, except the risk to the current management that the company's owners will sell it out from under them. The shareholders are the only identified third-parties, who are indirectly represented here by Southdown, and the only danger to them is management's unsupported assertion that some day, some way management would provide a greater benefit to the owners. Accepting that claim would cause the shareholders to lose an opportunity to sell their stock at a 68% premium over the market.

If the injunction is denied and if shareholders are not given the opportunity to vote on the recapitalization plan or the redemption of the rights so that they may tender their stock if they choose, their only remedy would be a derivative suit. The prospect of holding directors personally liable is remote, in time and efficacy. Moore McCormack's shareholders must have the choices available to them presented to them, either through a vote or through redemption of the pill.

*The Companies, Their Relationship, and the Principals.*

Southdown, Inc., is a Louisiana corporation with its principal place of business in Houston, Texas. A former sugar company, Southdown primarily manufactures cement and produces oil and gas. Southdown's chief executive officer is Clarence Comer. SDW, Inc., is a Louisiana corporation owned by Southdown and domiciled in Houston. Southdown's investment banker is Shearson Lehman Brothers, and that firm is represented before the court by Steven Wolitzer.

Moore McCormack Resources, Inc., is a Delaware corporation with its principal place of business in Stamford, Connecticut. A former U.S. flag shipping company, Moore McCormack manufactures cement and produces oil and gas. Moore McCormack's board is composed of outside directors; its chief executive officer is Paul Tregurtha. Moore McCormack's investment banker is Morgan Stanley, and that firm is represented before the court by David Lumpkins.

The chief reason that Moore McCormack would be an attractive acquisition for Southdown is that Moore McCormack's cement plants are in the east, while Southdown's operations are scattered through the south and southwest. The broader geographic range of the combined companies' operation would apparently strengthen the profitability through more effective marketing, averaging local slumps in construction, and production flexibility.

Tregurtha initiated discussions with Comer about the possibility of a merger in April 1987. They pursued these discussions in Texas. Because Southdown was not in a financial position to consummate a merger in 1987, the discussions ended. During these meetings, Tregurtha indicated that a combination was conditioned on his emerging as the CEO.

Southdown made its offer to Moore McCormack's owners in February 1988 without consulting further with Moore McCormack's executives. As soon as it announced the offer, Southdown began soliciting further talks with Moore McCormack's management, but Moore McCormack did not communicate with Southdown again until March 24th, when Tregurtha sent a letter inviting Southdown to increase its bid price. Southdown responded by raising its offer so that it falls above the mid-range of Moore McCormack's March 1988 valuation of the company by Morgan Stanley.

*Standing.*

Although the welfare of all Moore McCormack shareholders is affected by the outcome of this suit, Southdown stands to suffer a special injury from the unlawful frustration of its offer. Where a shareholder's complaint articulates a cause of action that is both individual and derivative, the shareholder may proceed with the individual action. *Elster v. American Airlines, Inc.,* Del.Ch., 100 A.2d 219, 223 (1953). From the moment Southdown became an active owner of Moore McCormack, Moore McCormack's management has treated Southdown *sui generis.* Moore McCormack's reaction to Southdown's offer is unique to Southdown; its goal of control is uniquely threatened by Moore McCormack's actions. Moore McCormack has had an exchange of ownership through the turnover of at least half of its shareholders since the announcement of Southdown's initial offer.

Additionally, Southdown states an injury under the Williams Act; Southdown urges that Moore McCormack's vague description of a recapitalization proposal in its amended 14D–9 schedule manipulated the market price of its stock through misleading information, in violation of § 14(e) of the Williams Act. This manipulation, South-

down alleges, also constitutes a breach of fiduciary duty because the only usefulness of the recapitalization plan is as an entrenchment device.

*The Offers.*

On February 23, 1988, Southdown made a cash tender offer for all the common stock of Moore McCormack at $31.00 per share. The offer included all equity or convertible debt securities that were convertible at a price equal to the common share equivalent; for simplicity, only the common stock will ordinarily be mentioned. Assuming all conversions were made and all options were exercised, Moore McCormack comprises about 12.8 million shares (full dilution).

At the beginning of this year, the stock of Moore McCormack was owned by about 5,000 holders, with no one owner having more than 14% of the total. Insiders own about 4%. Institutional investors had a total of 60%. The stock is actively traded on the exchange; in 1987, there were eight days on which over one million shares were traded, and there were forty on which 500,000 changed hands.

At the time of the initial offer the stock was trading at $24 per share on the New York Stock Exchange. Moore McCormack's stock has traded generally in the $20 price range for several years. In the late summer of 1987 the price reached almost $29. By the market crash in October 1987, Moore McCormack's stock was trading around $21. It dropped to slightly above $16 in the two weeks after the crash, rising unevenly to $23 at the end of January 1988.

The offer has been extended and changed three times.

(1) February 23 for $31.

(2) March 10 for $35.

(3) March 24 for $35 cash plus a $5 bond.

(4) March 28 for $40.00, to expire on April 6.

At $40, the total value of Southdown's offer is over $500 million. Any shares not tendered by the expiration date may be sold to Southdown for $40 cash with interest, under the terms of the last offer.

Fulfilling its Williams Act responsibilities, Moore McCormack issued a "short form" opinion to its shareholders that the $31 a share offer was "grossly inadequate" without an explanation of its inadequacy. The $35.00 was also denounced as inadequate. Apparently $40 is not considered inadequate, but Moore McCormack believes it can do better.

*The Poison Pill.*

After sustaining a $116 million loss in 1986 from the abandonment of its shipping business, Moore McCormack was left vulnerable to acquisition, since it had severely reduced financial flexibility. At Tregurtha's direction, Moore McCormack's management devised a plan that gave management the power to dilute drastically the value of any owner whose percentage of shares rose above 30%. Management has never submitted the plan for a vote of the stockholders. The plan is euphemistically called the shareholders' rights plan. The street calls it a poison pill. "As an obstacle to hostile [unsolicited by management] takeover attempts, the poison pill is unmatched except by dual-voting recapitalizations or direct majority share ownership by incumbent management." Ryngaert and Jarrell, *The Effects of Poison Pills on the Wealth of Target Shareholders*, 2 (S.E.C., Office of the Chief Economist, October 22, 1986).

The mechanics of the plan are complicated. If an outsider acquires 30% of the stock of Moore McCormack, each share of Moore McCormack common stock automatically carries with it an option to buy $140 worth of stock in Moore McCormack for $70 ("flip-in"). The rights attach as stock purchase rights to each outstanding share of common stock. Rights held by an owner of over 20% of Moore McCormack stock become absolutely void. Obviously, the owners in the 20% category would include a potential acquirer.

The Moore McCormack board has the power to redeem the rights for ten days after the rights attach. The redemption price is a nominal five cents per share. If the board does not act then, the rights can no longer be extinguished or redeemed, and

the damage to the excluded owners becomes irreversible.

Under the terms of the plan, stockholders who do not exercise their rights to buy Moore McCormack stock at half price can buy the stock of Southdown (or any other acquirer) at half price. This is called a "flip-over" provision. If Southdown accepts the stock tendered, unless the plan is redeemed, the equity acquired from selling shareholders by Southdown would partially be transferred to the non-selling shareholders. Southdown would need to be able to buy 85% of Moore McCormack's stock before it could profitably consummate its acquisition with the plan in place. As an example, should Southdown buy 50% of Moore McCormack, the impact of the plan would be to dilute its ownership to 16%. If Southdown were to buy 50% of Moore McCormack at $35.00 a share, the poison pill would cause Southdown to spend $737 million to acquire 100% of Moore McCormack, $283.7 million of which would be solely attributable to the poison pill.

Tregurtha confessed that there was no possible use of the plan for a business purpose in the operation of Moore McCormack's actual cement factories and oil fields. He acknowledged that the purpose of the plan was to stall an acquirer.

*The Scorched Earth.*

After telling its owners to reject the $31, Moore McCormack's management began to develop a plan to change the financial structure of the company in order to make it unattractive to a buyer. Again, Tregurtha conceded that nothing in the restructuring plans had any relation to Moore McCormack's operating or financing needs, like replacing inefficient plants or adjusting for changes in the cost of capital.

The board adopted a plan to recapitalize Moore McCormack. The result would be a company whose equity had been converted to debt. The means of the restructuring would be:

(1) Cash "dividend" of $24.60, payable
  (a) $15.50 initially and
  (b) $9.10 secondarily; and
(2) Bond for $6.62 (15–year subordinated debenture); and

(3) Common share.

Moore McCormack secured a commitment from Chemical Bank for a loan of $412 million, $315.8 million of which would be distributed to shareholders, with the remaining $104 million in a revolving credit agreement. This recapitalization plan was briefly mentioned in a 14D–9 schedule. On March 23, Moore McCormack's directors adopted the plan of recapitalization. After recapitalization, Moore McCormack will be left with a negative net worth of $60 million. The recapitalization would not take place if over 50% of Moore McCormack was acquired by one party.

The $24.60 in cash must be paid in two installments because a single payment now would render the company insolvent. The second payment is contingent on an appraisal revaluing the company's assets significantly upward. Morgan Stanley values the bond at its face amount because the interest rate will be set at a level sufficient to make it trade in the secondary market at par on the day of issue; Morgan Stanley made no allowance for interest rate changes or risk to the principal. The company is vulnerable to the recurring slumps in the construction industry. The factors that make a fully-leveraged Moore McCormack unattractive as a merger or acquisition prospect also make it considerably less able and resilient as an independent company.

After the proposed refinancing, the owners would continue to hold their shares of common stock, representing the speculative equity. Wall Street jargon refers to that residual, speculative equity as a "stub" or "rump". Morgan Stanley estimates Moore McCormack's stub value to be between $1 and $3 a share. Moore McCormack admits that the total value of the recapitalization plan is under $39 a share, only $24.60 of which is liquid; however, Tregurtha persists in maintaining that the recapitalization is superior to Southdown's offer. Cash now of $40, he says, is less valuable than $24.60 in cash, a junk bond for $6.62, and a share of rump equity in a company fully mortgaged to Chemical Bank.

Moore McCormack witnesses insisted that the management plan "created" more value for the owners than Southdown's offer. Moore McCormack is not creating anything; it is converting their equity in a company into debt. The value is either there intrinsically or it is not. Individual shareholders who put a premium on liquidity either sold their shares long ago or borrowed against them at about them same rate that management proposes. The cash of $24 a share from the company's borrowing for all shareholders is about 60% of the $40 per share price. The individual could borrow 70% without crippling the company.

No business reason for the plan was offered by Moore McCormack except to defeat Southdown's offer. Wall Street slang refers to this tactic as "scorched earth" and not as "value maximization".

*Breach of Duty.*

The characteristic feature of American business has been the alienation of ownership from control. The corporate form has allowed the development of enterprises of immense wealth and intricate complexity, but as the ownership diffused, the distance between the managers and the owners increased. To supplement the common law duty of a trustee for fidelity, the government has added statutory requirements.

The policy of the law, inherited and enacted, is dual. First, those who control publicly owned companies owe the owners absolute fidelity. The collective interest of the owners, as a class, determine the goals of the hired stewards. Rational owners know that their interests are intertwined with the interests of the people who work at their company, the communities where the facilities are located, and the suppliers and customers. Unfortunately, alienation of ownership, aggravated by bureaucratization, has diminished the professional manager's sense of commitment to the people who own the company.

■ Second, the managers owe full disclosure to the shareholders and to the public at large. The information furnished through the required reports reflects the recognition that (a) each owner is entitled to equal knowledge with the managers and others about his company, (b) each member of the public is a potential share owner, and (c) the open market is the most efficient mechanism for exchange.

Under Delaware law, corporate directors have a trustee's duty of loyalty and care. The duty of care obliges directors to make informed decisions, and the duty of loyalty obliges them to act in good faith to the owners, without self interest. *Guth v. Loft,* 5 A.2d 503, 510 (Del.1939). "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozo, C.J.). The shareholders own the business; directors are their trustees; management works there.

Under the business judgment rule, when a board acts in good faith, a court will not substitute its judgment for that of the board as long as the decisions are attributable to "any rational business purpose" of the owners. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985). In most circumstances, the manner owners choose to conduct their business is of no concern to the court. When the ownership is estranged from control, the owners' delegates as trustees must exercise this business judgment for the direct and uncompromised benefit of the owners. The original reason for the business judgment rule was to reduce the opportunity for one faction of owners to enlist the aid of the court to change a policy decision that may be an error but free from defalcation. Secondly, courts are not institutionally capable of managing businesses, as experience with operating receiverships generally shows.

Ordinarily, the business judgment rule provides a presumption that in making a business decision the directors of a corporation acted only after they were appropriately informed and after they had honestly determined "that the action taken was in the best interests of the company." Because contests for control have an "omnipresent specter that a board may be acting primarily in its own interests," the di-

rectors have an enhanced duty to prove that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership." *Id.* at 954–55. This burden may be partially satisfied when the board's actions are approved by outside, independent directors. One way to minimize conflicts of interest is for the company to hire a special committee, whose compensation is not affected by the outcome to evaluate legal and financial reports. Simpson, *The Emerging Role of the Special Committee*, 43 *Bus.Law.*, 674 (1988).

The Delaware Supreme Court has announced an enhanced duty on the part of directors faced with an unsolicited offer to acquire control of the company. The directors' burden is good faith, reasonable investigation, and proportion. The duty of restraining management to proportionate responses requires that the directors approve only those defensive acts that are reasonable in relation to the threat posed. The first two parts are restatements of the general duty, but the duty of proportion entails that the directors understand both whom the threat endangers and whom the defensive reaction will ultimately harm.

*The Board's Performance.*

All of Moore McCormack's directors will lose their $20,000 a year positions. Tregurtha stands to lose his employment, prestige, and power. All the directors were management nominees. None except Tregurtha owns significant stock. Insiders own collectively about 4%.

Moore McCormack adopted its shareholders' rights plan without a shareholder vote in 1986 after it lost $116 million. Several by-law changes were also enacted that strengthened management's control. Setting up barriers to owner control after a disastrous performance supports an inference that the action was not taken to serve the shareholders.

The revalued stock options for Tregurtha indicates that the directors have placed their personal relationships above the shareholders' rights. Tregurtha (together with other managers) had options to purchase about 260,000 shares of common stock from the company at an exercise price of $32. The stock, even in the boom, never rose above $29. For Tregurtha to have exercised the option in August 1987 would have been an immediate loss of around $1.5 million. The market crashed. At the bottom, exercising the options would have meant Tregurtha's paying the difference between $32 and $16.50 as a donation to the company. In December 1987, the board reduced the exercise price from $32 to $18, which was then the current price. Thousands of investors, present and former shareholders of Moore McCormack, had just suffered a market loss in excess of $100 million. Those who survived had their shares diluted by the board giving their earning potential to insiders. When the price was depressed, Moore McCormack was again likely to be the target of a bulk offer, and the outstanding options increased the cost to an acquirer with no benefit to the company.

It was Moore McCormack's position early in these proceedings that it had a duty to fend off an unsolicited offer because it is the directors' duty to maintain the business as an operating enterprise. If the directors cannot devise a business plan that earns a sufficient return to justify the owners investment in the present form, a liquidation, merger, or disconglomeration may be required by their duty to profit the owners. It is instructive here that Moore McCormack has not hesitated to abandon a line of business in the past. Acquisitions are a frequent occurrence in the business world, and liquidations or divestments are occasional. Indeed, Moore McCormack's response to Southdown's offer contemplates, or more accurately contrives, to employ a combination of drastic techniques to transmute the company for no reason remotely related to the real-world business context of Moore McCormack as an operating company.

Southdown has, at this preliminary stage, rebutted the presumption of shifting the burden of justification to Moore McCormack.

To determine whether a board of directors has violated its fiduciary duty to its shareholders in enacting or taking actions under a challenged rights plan, courts have said that the court must examine the motivations of the board as it made its decisions, from the initiation of the plan to any actions taken under it. *Moran v. Household International, Inc.*, 500 A.2d 1346, 1356 (Del.1985) (*citing Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del.1985)). It must consider whether the board made an informed decision based on reasonable investigation, considered on a standard of gross negligence, or perhaps of reasonable diligence. And it must evaluate the reasonableness of the board's actions as a response to any given threats it perceives to the company. *CRTF Corp. v. Federated Dept. Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988).

■ None of the standards is particularly helpful, but for the purpose of this preliminary relief, the standard to be applied should be whether a fully informed, wholly disinterested, reasonably courageous director would dissent from the board's act in any material part. The subjective good faith of the participants is irrelevant; it is rational and objective fidelity by which they shall be judged.

The presence or threatened use of a poison pill does not in itself indicate that management is motivated only by self-interest. Legitimate uses of the pill include driving a bidder to the negotiating table or preventing shareholders from being stampeded in a coercive offer in which late sellers receive an inadequate price for their stock.

Southdown's all cash, non-coercive offer is to be distinguished from two-tiered, front-end loaded offers, as was the subject in *Federated*. Unlike this case, Federated used its poison pill as a gavel in an auction in which a new bidder, Macy's, was vying for the company and engaged CRTF in a bidding war. CRTF offered a small class of early tenders substantially better terms than later tenders. Southdown offers all shareholders the same amount for their stock whether before or after Southdown

has a majority, enabling them to make a decision about selling, on neutral economic criteria without pressure of potential exclusion.

Although Moore McCormack claims the presence of its pill initially served a beneficial purpose by stalling the tender offerers in litigation, increasing the management and the market's response time to the offer, its use now threatens the company's financial health and the rights of all shareholders.

The claimed benefits are unrelated to the pill. The free market was ahead of Moore McCormack's management by several days, and the Williams Act gave the owners of Moore McCormack ten days to consider the offer irrespective of any pill. The free market has pushed Southdown; no apparent pull has been exerted by Moore McCormack.

Parenthetically, Moore McCormack has argued that Southdown was preying on Moore McCormack's shareholders by pouncing with its offer while the price was artificially depressed by the October 1987 correction in the stock market. In truth, Moore McCormack's stock had returned to near its recent issue-term trendline.

The Williams Act requires that a tender offer remain open for ten business days. Because Southdown's offer has been amended three times, the earliest date for acceptance had also to be extended. Congress determined that ten days was a reasonable time for management to respond and owners to consider a tender offer. Moore McCormack has had over forty days to shop the company. There are no other bidders. Tregurtha's assertion that his company is for sale is half true; the company appears to be for sale only on terms that are acceptable to management but that will not necessarily benefit the stockholders.

In an auction, "the directors' role remains an active one, changed only in the respect that they are charged with a duty of selling the company at the highest price attainable for the stockholders' benefit." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, at 184, n. 16

(Del.1986). The directors' responsibility in carrying out their fiduciary duty becomes "the maximization of the company's value at a sale for the stockholders' benefit." *Revlon,* at 182. "The trustee is free to stand aloof, while others act, if all is equitable and fair. He cannot rid himself of the duty to warn and to denounce, if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to his practiced eye." *Globe Woolen Co. v. Utica Gas & Elec. Co.,* 224 N.Y. 483, 489, 121 N.E. 378 (Cardozo, C.J., 1918).

The board of Moore McCormack is no longer attempting to use its poison pill to increase the price of the stock. Moore McCormack's own estimate of the breakup value of their company, based on an April 1987 analysis by Morgan Stanley, was $31.25 a share. In December 1987, Moore McCormack reported stockholders' equity of $296.5 million. Recognizing that accounting practices and SEC reporting standards do not reflect every aspect of reality, even the investment bankers' valuation methods produced answers reasonably near Southdown's last three offers. Yet Moore McCormack called the $31 a share offer grossly inadequate. The opinion of Moore McCormack's investment advisor lacks support by verifiable facts; the only explanation for the revaluation being up 26%, in less than a year, is the interest spurred by Southdown.

On February 8, 1988, two weeks before Southdown's offer, Tregurtha made an announcement to the shareholders and the investing public of Moore McCormack's financial and operating position. The company said (1) it had completed all needed restructuring, (2) its oil operations were significant for the future, (3) acquisitions were contemplated, and (4) long term debt was being reduced through increased earnings and cash flow. Now, in the face of competition for ownership that threatens the incumbent management, Tregurtha testified that the board plans to pursue a course of action that is contrary to each of these recently stated points.

During the 1987 merger negotiations Tregurtha told Comer that a condition of the merger would be that he retain his position as CEO. He also explained to Comer that the Moore McCormack directors (some of whom have interlocking directorships on other corporations or institutions) had cordial and long-standing relationships. Tregurtha and the directors sit on the compensation committee. Tregurtha and the directors sit on the compensation committee. Direct expressions of personal interest combined with the lack of a credible explanation of why Southdown's offer is inadequate or of how the recapitalization increases Moore McCormack's value contradicts Tregurtha's assertion that he is exercising independent business judgment and shifts the burden to him to show why management's obstinance in the face of its best offer does not constitute a breach of fiduciary duty.

The ample financial data indicates that Moore McCormack's conclusory statement about the inadequacy of Southdown's offer is, at best, a market-manipulative falsehood to perpetuate the management's incumbency. Moore McCormack, borrowing dollar for dollar of assets, could only secure $420 million of financing to liquidate the company. That suggests that there is insufficient collateral or value in the company to obtain over $35 a share. The stock's highest price over the last two years was $28.75. Before February 23, 1988, Moore McCormack's stock was trading around $22 a share. The current offer reflects a 68% premium over the pre-offer market. Morgan Stanley's March 1988 valuation of the company begins at a range that is only $1.78 from Southdown's second offer of $35.00 a share. The March 28 offer falls well within Moore McCormack's own valuation.

Defensive tactics such as the poison pill must be evaluated in relation to the threat posed. Federated adopted its poison pill when it was faced with a threat that Donald Trump, an adversary in certain real estate deals, would gain an upperhand in real estate negotiations by acquiring a portion of Federated stock. Federated also "feared" green mail, but a board only

needs integrity to avoid buying out large shareholders who they fear will threaten their incumbency. *CRTF* at 21. Moore McCormack created its poison pill in 1986 right after the company suffered a $116 million loss. Even if its creation may have been reasonable in 1986, its detonation now clearly poses a threat to the share owners' profitability.

Southdown's initial offers, unlike CRTF's, were not coercive, two-tiered, front-end loaded bids with a timing advantage. The initial tender was simple, uniform, straight-forward, and nondiscriminatory. Moore McCormack has not successfully solicited any competing bids. There is no evidence that the rights plan can be used to increase the value bid for Moore McCormack. Over the five weeks that Southdown's offers have been outstanding, the market has indicated that a fair price for Moore McCormack may be in the mid $30 range.

It appears that within a week of Southdown's announcement of its offer, about 25% of the institutional holders and 80% of the public holders have sold their stock in Moore McCormack to investors other than Southdown; the company is held primarily by professional speculators, but management owes the same duty of rational business judgment and punctilious fidelity to short-term traders as it does to long-term personal investors. No one is being coerced.

Although Southdown's offer to the shareholders was unsolicited, the only affected people to whom it can honestly be said to be hostile are the directors and management. The Southdown offer elevated the stock price beyond any level management had been able to reach by their operating performance.

If enough people sell their shares to Southdown, the non-selling owners have the option to sell to Southdown or to require an independent appraisal under Delaware corporation law.

At no point in these proceedings has Moore McCormack's management expressed a willingness to submit the restructuring and the tender to a vote of the shareholders. Yet Southdown wants the shareholders to have the opportunity to vote, to vote by tendering or retaining their shares. Moore McCormack's management has had four times the delay required by federal securities law to persuade the owners to choose management over merger. It is time to allow the owners more freedom and less protection.

"When ... battles for corporate dominance spawn legal controversies, the judicial role is neither to displace the judgment of the participants nor to predetermine the outcome. Rather, the responsibility of the court is to insure that rules designed to safeguard the fairness of the takeover process be enforced." *Norlin v. Rooney, Pace,* 744 F.2d 255, 258 (2d Cir.1984).

The court finds that Southdown has demonstrated a likelihood of succeeding on its claim that non-redemption of the poison pill will constitute a breach of fiduciary duty by Moore McCormack's board of directors. Similarly, the recapitalization plan has not been justified under the business judgment rule. The evidence thus far raises an additional unresolved question of whether Moore McCormack's poison pill unlawfully discriminates against Southdown under Delaware law.

*The Williams Act.*

Southdown's entitlement to injunctive relief based on its Williams Act claims is a closer question. Moore McCormack's brief reference to the recapitalization proposal in its 14D–9 schedule could have been more informative, but the absence of such details may not have amounted to a material misrepresentation designed to manipulate the market artificially. Although the next Williams Act claim may coincide with much of the fiduciary duty claim, at the trial, Southdown will have the opportunity to establish that the manifold errors by the directors were in fact calculated to manipulate the market, without rational business or owner interests as the object.

In reviewing the authorities on the use of the exclusionary-rights pill, it has occurred to the court that its only justification of buying time may be preempted by the

Williams Act. Alternatively, at the trial, the legitimate use of what may be a patently illegal device must be considered carefully for its relation to the whole body of corporate, trust, and securities law.

*Conclusion.*

The self-interest of management, the dereliction of the directors, the nonexistence of a business purpose for management's principal tactics, the implausibility of Moore McCormack's justifications, the contradiction of Moore McCormack's equivocal testimony by its acts in the recent past, and the manifest contrivance of Moore McCormack's impediments to the market compel the restraint of management until the owners of Moore McCormack have the opportunity to exercise their business judgment, while Southdown's offer is confined under the securities laws.